UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X



JEFFREY ESPINOSA, by his    :
next friend JULY ESPINOSA, on :
behalf of himself and of all  :
others similarly situated,    :
                        :
        Plaintiffs,    :
                        :
   v.                     :
                        :
                        :
                        :
NIRAV R. SHAH, M.D., in his   :
official capacity as       :
Commissioner, New York State  :
Department of Health and     :
KRISTIN M. PROUD, in her     :
official capacity as       :
Commissioner, New York State  :
Office of Disability        :
Assistance,              :
                        :
        Defendants.   :
                        :
------------------------------X

09 Civ. 4103 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Chief United States District Judge:

      Plaintiff Jeffrey Espinosa, on behalf of himself and a class of similarly situated persons, brings this action against the New York State Department of Health ("DOH") and the New York State Office of Temporary and Disability Assistance ("OTDA") (collectively, "Defendants"), to enjoin Defendants' allegedly routine failure to provide final administrative action to Medical Assistance ("Medicaid") applicants and recipients who

1

request administrative hearings within ninety days of the date
of that request, as required by 42 C.F.R. § 431.244(f)(1).

By Memorandum and Order dated September 21, 2012, this
Court granted Plaintiff's motion for class certification and
certified a class pursuant to Federal Rule of Civil Procedure
23(b)(2)("Espinosa Class", each a "Class Member").[1]  (See Order,
Sept. 21, 2012 [dkt. no. 67] ("Class Certification Order").)
That same day, this Court issued a separate order denying
Defendants' motion for summary judgment and granting Plaintiff's
motion for partial summary judgment.  (See Order, dated Sept.
21, 2012 [dkt. no. 68] ("Summary Judgment Order").)  On
September 27, 2013, this Court partially granted and partially
denied Defendants' motion for reconsideration and granted
Plaintiff's motion to substitute the class representative.[2]  (See
Order, dated Sept. 27, 2013 [dkt. no. 90].)  Thereafter, this

---

[1] Defined by the Class Certification Order as "[A]ll current and
future New York State applicants for or recipients of Federal
[Medical Assistance] Medicaid who have requested or will request
fair hearings for whom Defendants fail to render a fair hearing
decision within ninety days from the date of the request,
excluding adjournments requested by the appellant.  The class
will exclude members of the [Shakhnes ex rel. Shakhnes v.
Eggleston, 740 F.Supp.2d 602 (S.D.N.Y. 2010), aff'd in part,
vacated in part 689 F.3d 244, 262 (2d Cir. 2012)] and
[Varshavsky v. Perales, 202 A.D.2d 155 (N.Y. 1994)] classes."

[2] Class representative Marie Menking died on or about June 8,
2013, and intervening plaintiff Jeffrey Espinosa was substituted
as class representative by this Court's September 2013 Order.

Court denied Plaintiff's application to amend the class definition. (See Order, dated Apr. 4, 2014 [dkt. no. 103].) The net result of this Court's Orders is that Defendants are responsible for providing a final decision after fair hearing ("DAFH") to Class Members within ninety days from the date the Class Member requests a fair hearing, not counting days that result from adjournments requested by the Class Member.

Litigation was stayed while counsel engaged in settlement negotiations in an attempt to arrive at a jointly agreed-upon proposed injunction.  However, settlement negotiations proved unsuccessful,[3] and this Court granted the parties' request to present proposed orders for this Court's approval. (See Order, dated June 3, 2014 [dkt. no. 109].)  For the reasons set forth below, Plaintiff's motion to approve its proposed order [dkt. 115] is DENIED, and Defendant's motion to approve its proposed order [dkt. 110] is GRANTED in part.

---

[3] See Order, dated Nov. 12, 2013 [dkt. no. 97]; Order, dated Dec. 23, 2013 [dkt. no. 100]; Letter from Robert L. Kraft to the Court, dated May 2, 2014 [dkt. no. 104]; Letter from Aytan Y. Bellin to the Court, dated May 2, 2014 [dkt. no. 105].

I.   BACKGROUND[4]

A. The Administrative Fair Hearing Process[5]

Public benefit programs provide the recipient of the benefit the opportunity to request an administrative fair hearing before an impartial hearing officer to challenge a notice issued by, or some other determination of, the agency that provides the benefit to the recipient.  N.Y. Soc. Services Law § 22.  In New York, Medicaid-related notices and determinations are issued by the New York City Human Resources Administration ("NYC HRA") and the fifty-seven county social services departments, managed care and managed long term care providers, and other agencies (collectively "social services districts").  (Amiraian Decl. ¶5.)

The Office of Administrative Hearings ("OAH") schedules, conducts, and decides fair hearings on behalf of DOH as part of Medicaid.  (Id. ¶7.)  The scheduling and holding of fair hearings, as well as final administrative action, must occur within ninety days following fair hearing requests.

---

[4] The Court's recitation of facts is based on the following declarations and exhibits attached thereto: Declaration of David B. Amiraian, dated July 17, 2014 [dkt. no. 112] ("Amiraian Decl."); Declaration of Robert L. Kraft, dated July 18, 2014 [dkt. no. 113] ("Kraft Decl."); Declaration of Nina Keilin, dated July 18, 2014 [dkt. no. 117] ("First Keilin Decl."); Declaration of Aytan Y. Bellin, dated Aug. 29, 2014 [dkt. no. 121] ("Bellin Decl.); Declaration of Nina Keilin, dated Oct. 3, 2014 [dkt. no. 125] ("Second Keilin Decl.").

[5] See generally Shakhnes, 740 F. Supp. at 610-11.

42 U.S.C. § 1396a(a)(3); 32 C.F.R. § 431.244(f); State Medicaid Manual §§ 2903.2(A), 2902.10.  Issuance of the DAFH is considered final administrative action.  (Amiraian Decl. ¶10.) In calendar year 2013, Class Members made 56,702 fair hearing requests, had 75,779 fair hearings scheduled, and received 16,060 DAFS.[6]  (Id. ¶9.)

B. Initial Settlement Negotiations

In a joint status update dated October 29, 2013, the parties stated their "hope to resolve this case through entry of an injunction without further litigation."  (See Joint Status Update Letter to the Court, dated Oct. 31, 2013 [dkt. no. 96].) To that end, the parties held an in-person meeting on November 18, 2013, during which Plaintiff requested certain statistical information regarding Medicaid applicant requests.  (See Joint Status Update Letter to the Court, dated Dec. 19, 2013 [dkt. no. 99].)  Defendants provided those statistics and responded to Plaintiff's supplemental and subsequent inquiries.  (See id.) Thereafter, the parties agreed that all litigation deadlines be stayed pending the conclusion of settlement efforts.

---

[6] In calendar year 2013, for all programs, OAH received 326,872 requests for fair hearings, scheduled 348,820 fair hearings, and issued 125,515 fair hearing decisions.  (Amiraian Decl. ¶8.)

C. The "Backlog"

The majority of Plaintiff's inquiries related to the so-called "backlog"—any unscheduled, or behind schedule, requests made by a Class Member. (See Amiraian Decl. ¶13; First Keilin Decl. ¶2.)  This raw number reflects the number of fair hearing requests by Espinosa Class Members in which the OTDA has exceeded the ninety day statutory limit.  According to the Fair Hearing Information System ("FHIS"),[7] as of November 18, 2013, there were 6,511 requests from Class Members residing in New York City that had not been scheduled for a hearing[8] and an additional 1617 unscheduled cases state-wide.  (See Amiraian Decl. ¶¶ 22-23; Statistical Summary January 2013 – March 2014, First Keilin Decl. Exs. A, D ("Class Statistics"); Email from Robert L. Kraft, dated Dec. 17, 2013, First Keilin Decl. Ex. C. ("Dec. 2013 Kraft Email").)

At the November 2013 meeting, David B. Amiraian, Principal Administrative Law Judge for the OAH (Amiraian Decl. ¶2), informed Plaintiff's counsel ("Class Counsel") that "elimination of the backlog [is] essential to achieving timely

---

[7] All OAH statistics related to fair hearing requests are stored in the FHIS database.  (Amiraian Decl. ¶6).

[8] The New York City Class Members are the largest segment of the Espinosa Class.  (Amiraian Decl. ¶22.)  At that time, there was also an unspecified number of backlogged cases state-wide.

final administrative action, and that it would take approximately one year (i.e., until approximately November 2014) to reduce the backlog to a point at which OAH could be fairly subject to monitoring for timeliness." (Id. ¶23.)

To that end, during the November 2013 meeting, Plaintiff suggested that Defendants hire outside experts to assist in reducing the backlog. (First Keilin Decl. ¶¶ 2.) In response, Defendants cited a number of on-going reforms and proposals intended to reduce the backlog, and advised Plaintiff that these efforts were "highly likely" to eliminate the extant backlog by November 2014. (Amiraian Decl. ¶15.) Moreover, Defendants framed these as preemptive measures against future surges in hearing request volume. (Id.) As a result, Plaintiff agreed to allow Defendants a reasonable amount of time to demonstrate progress in eliminating the backlog. (First Keilin Decl. ¶3.)

1. Defendants' Efforts to Eliminate the Backlog

The Summary Judgment Order makes clear that Defendants are responsible for meeting the ninety day deadline for issuing a DAFH. Measuring timeliness of a final administrative action is the sum of two separate time periods: (i) the time from fair hearing request to the date of the hearing excluding adjournment time requested by the Espinosa Class Member and (ii) the time

7

from the final date of the hearing to decision issuance.
(Amiraian Decl. ¶11.)  Failure to meet the ninety day deadline
is sometimes attributable to challenges within the first time
period; namely, the volume of hearing requests, weather, and
other factors not necessarily within OAH's control.  (Id.)  The
second time period, from the date of the hearing until the
Administrative Law Judge ("ALJ") drafts a decision and the OAH
issues a DAFH, is much more within OAH's ability to monitor and
expedite, when necessary.  (Id. ¶14.)

It is therefore unsurprising that most of Defendants'
active and proposed remedial efforts focus on monitoring and
shortening the time period between a Class Member's fair hearing
and DAFH issuance.  Specifically, Defendants have increased both
the number of cases per calendar for certain ALJs and the number
of calendars total.  (Id. ¶¶ 18-20.)  Defendants also hope to
promulgate regulations providing for the use of video fair
hearings, thereby allowing ALJs to be deployed across the state
as needed.  (Id. ¶21.)

Defendants have also attempted to improve the initial
time period—from request to hearing.  The cornerstone of that
effort is the newly-implemented Pre-Hearing Disposition ("PHD")
process.  (Id. ¶16.)  Under the PHD process, the OAH
periodically sends lists of cases to the social services

districts with the largest backlogs, affording those agencies the opportunity to review those matters and inform OAH of the cases on which they intend to withdraw their action.  (Id.) Such withdrawal moots any administrative appeal and therefore obviates the need to schedule a fair hearing.  The OAH proposed a financial incentive for social service districts to use the PHD process and, more generally, to use good judgment in making Medicaid determinations.  (Id. ¶17.)  That proposal became law earlier this year and took effect April 1, 2014.  (Id.)  It essentially functions as a penalty for social services districts that are responsible for a disproportionate number of statewide fair hearing requests if a certain number of those requests are either withdrawn after scheduling a fair hearing or reversed on appeal.  (See Part I of Chapter 58 of the Laws of 2014, Amiraian Decl. ¶17, Ex. 1.)

### 2. The Parties Disagree on Backlog Reduction

December 2013 is the last point the parties partially agree on backlog statistics.  At that time, Plaintiff and Defendants agree the backlog of fair hearing requests originating in New York City was 5,969, and that there were an additional 1,617 unscheduled cases state-wide.  (See First Keilin Decl. ¶ 4; Dec. 2013 Kraft Email.)  Plaintiff therefore concludes the state-wide December 2013 backlog numbered the sum

of 5,969 and 1,617, equal to 7,586.[9]  (First Keilin Decl. ¶4.)
Defendants, meanwhile, maintain that "unscheduled" does not
necessarily mean "backlogged," and does not include the 1,617
figure in the backlog total.[10]  (See Amiraian Decl. ¶ 25.)  Using
the December 2013 statistics—and opposing calculations—as a
point of departure, the parties advance divergent arguments with
respect to compliance with the Summary Judgment Order.

Defendants cite several statistics as proof of
progress.  Per FHIS, backlogged requests originating from New
York City decreased from 5,970[11] as of November 18, 2013, to
1,548 as of July 12, 2014.  (Id. ¶25.)  Of those 1,548
backlogged cases, approximately 900[12] are either unscheduled
prior to the initial hearing date at appellant's—the Class

[9] Plaintiff argues that the "number of unscheduled hearing
requests says nothing about the total number of unscheduled,
scheduled and heard fair hearing cases [that] have not been
decided within 90 days of the requests for such hearings."
(Pl.'s Resp. 3-4.)

[10] Defendants maintain that the data provided to Plaintiff
"addresses activity related to all fair hearings requested by
class members" and attribute any alleged inaccuracy to
Plaintiff's (i) mistakenly including Shahknes and Varshavsky
class members in the total and (ii) incorrectly assuming that
all cases in the unscheduled backlog are beyond ninety days."
(See Email from Robert L. Kraft, dated July 25, 2014, Bellin
Decl. Ex. C.)

[11] The exact number is 5,969, despite Defendants' use of a round
number in the Amiraian Decl.  (Dec. 2013 Kraft Email.)

[12] The exact number is 893.  (Amiraian Decl. ¶25.)

Member's—request or involve rescheduled hearings due to appellant-requested adjournments.  (Id.)  Subtracting those cases from the total backlog yields a backlog of 655, reflecting a reduction of approximately 550 per month since November 2013. (Id. ¶¶25-26; Statistical Chart, Ex. 2.)  For the month of June 2014, Defendants state that OAH provided final administrative action to Class Members within ninety days in 86% of fair hearing requests in the most consequential cases, those without aid-continuing,[13] and 82% of aid-continuing cases.  (Id. ¶27.)

To the contrary, Plaintiff states the backlog has increased.  (First Keilin Decl. ¶¶ 4-5.)  For example, according to Plaintiff, there was a backlog of 6,721 as of March 2014. (Id. ¶4.)  It should be noted that this number appears to include backlogged New York City cases and all unscheduled cases state-wide, just as Plaintiff interpreted the December 2013 statistics.  Rather than predict that the backlog will be eliminated by November 2014 (see Amiraian Decl. ¶23-24),

---

[13] If aid-continuing is in place, the individual requesting the fair hearing is challenging a reduction or discontinuance in care, and the pre-reduction or pre-discontinuance level of care remains in place.  Where a request for aid-continuing is untimely, or where the challenge is to a social services district's decision not to provide increased care, aid-continuing may not be provided.  It follows that non-aid-continuing requests are therefore time-sensitive and of greater consequence.  (See Amiraian Decl. ¶27.)  This distinction is discussed below in greater detail.

11

Plaintiff describes the current state of affairs as a "seemingly intractable continuation of delay" which will remain unsolved without outside guidance (First Keilin Decl. ¶5).

D. Proposed Orders

After the parties were unable to agree on a settlement, this Court granted their request to present proposed orders providing for injunctive relief. On July 18, 2014, Plaintiff [dkt. no. 115] and Defendant [dkt. no. 110] each moved this Court to enter their respective proposed orders.[14] Thereafter, Plaintiff[15] and Defendants[16] submitted further briefing in support of their respective positions.

---

[14] See, Corrected Proposed Order, First Keilin Decl. Ex. B. ("Pl.'s Proposed Order"), and Proposed Order, Kraft Decl. Ex. 3 ("Defs.' Proposed Order") (collectively, "Proposed Orders").

[15] Memorandum of Law, dated July 18, 2014 [dkt. no. 117] and Corrected Memorandum of Law, dated July 22, 2014 [dkt. no. 118] (together, "Pl.'s Memo"); Plaintiff's and the Class'ss [sic] Response to Defendants' Memorandum of Law in Support of Defendant's Proposed Order, dated Aug. 29, 2014 [dkt. no. 120] ("Pl.'s Resp."); Plaintiffs' Reply Memorandum of Law in Further Support of its Motion for Remedies, dated Oct. 3, 2014 [dkt. no. 124] and Plaintiffs' Corrected Reply Memorandum of Law in Further Support of its Motion for Remedies, dated Oct. 5, 2014 [dkt. no. 128] (together, "Pl.'s Reply").

[16] Defendants' Memorandum of Law in Support of Motion to Approve Defendants' Proposed Order, dated July 18, 2014 [dkt. no. 111] ("Defs.' Memo"); Defendants' Memorandum of Law in Opposition to Plaintiffs' Proposed Order, dated Aug. 20, 2014 [dkt. no. 119] ("Defs.' Resp."); Defendants' Reply Memorandum of Law in Further Support of Their Proposed Order, dated Oct. 3, 2014 [dkt. no. 127] ("Defs.' Reply").

II.  DISCUSSION

     The Proposed Orders, and the parties' briefing in
support of those orders, involve several types of injunctive
relief—monitoring, notice, interim benefits, financial penalty
for noncompliance, and duration—but differ as to the extent and,
in some cases, the suitability, of that relief.  II.A. sets out
the general legal standard for reviewing the scope and type of
injunctive relief issued by a district court.  More specific
legal authority with respect to each category of injunctive
relief is discussed in II.B, together with a review and analysis
of the Proposed Orders.

  A. Legal Standard

     "The standard for reviewing the scope and type of
injunctive relief issued by a district court is whether the
relief amounts to an abuse of the court's equitable remedial
discretion."  Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988).  The
Court of Appeals has stated that a district court has broad
discretion in fashioning an equitable remedy for a
constitutional violation.  Ass'n of Surrogates v. N.Y., 966 F.2d
75, 79 (2d Cir. 1992), modified on reh'g, 969 F.2d 1416 (2d Cir.
1992).  However, the court's "[d]iscretion to frame equitable
relief is limited by considerations of federalism, and remedies
that intrude unnecessarily on a state's governance of its own

affairs should be avoided." Id.; see also Dean v. Coughlin, 804
F.2d 207, 213 (2d Cir. 1986) ("Although a federal district
court's powers are broad, appropriate consideration must be
given to principles of federalism in determining the
availability and scope of equitable relief ... ."). 
Accordingly, the Court of Appeals has emphasized that "[f]ederal
courts must take care to exercise a proper respect for the
integrity and function of local government institutions." Ass'n
of Surrogates, 966 F.2d at 79; see generally Schwartz v. Dolan,
86 F.3d 315, 319 (2d Cir. 1996) (summarizing federal district
court powers with respect to issuing injunctive relief).

In the context of unconstitutional prison conditions,
the Court of Appeals noted that "the court may be tempted to
right the wrong by assuming control of the entire system in
which the offensive condition exists and prescribing a new
system deemed to meet constitutional requirements." Dean, 804
F.2d at 213.  The Supreme Court has warned against that impulse,
repeatedly cautioning courts "to give the state a reasonable
opportunity to remedy a constitutional deficiency, imposing upon
it a court-devised solution only if the state plan proves to be
unfeasible or inadequate for the purpose." Id., see also
Schwartz, 86 F.3d at 319.  Where government defendants have
expressed intent to comply with a Court ruling and are

14

"presently in the process of achieving full compliance with it," a court may decline to issue a permanent injunction and instead retain jurisdiction for a period of time to address any future noncompliance.  See Nelson v. Sugarman, 361 F.Supp.1132, 1142 (S.D.N.Y. 1972).

    B. Analysis

    1. Factual Findings: Success Rate

        The content of the injunction issued by this Court is dependent on settling the underlying factual dispute.  Of critical importance is whether—and, if so, to what extent—Defendants have complied with this Court's Summary Judgment Order, mandating Defendants' adherence to federal and state law regarding Medicaid fair hearing requests.  (See Summary Judgment Order at 23.)  This is especially true given the Court's broad discretion under the applicable legal standard.  Determining an appropriate exercise of this Court's "equitable remedial discretion," Eng, 849 F.2d at 82, is contingent on the degree of noncompliance.  Plaintiff claims Defendants have not made progress in complying with the Summary Judgment Order; Defendants assert the opposite and maintain that full compliance is forthcoming.

Central to the disagreement is the parties' differing interpretations of the same FHIS data;[17] specifically, how to calculate Success Rate.  (See Class Statistics; Email from Robert L. Kraft, dated July 25, 2014, Bellin Decl. Ex. C.) According to Defendants, Success Rate for a given month equals the number of timely-issued DAFHs in that month ("Successes") divided by the total number of DAFHs issued that month, expressed as a percentage.  For example, in October 2013, Defendants issued 1,018 DAFHs, and 688 of those were Successes, yielding a 67.6% Success Rate.  (See Class Statistics.) Plaintiff argues instead that the appropriate formula is "the total percentage of fair hearing requests, out of the total number of pending fair hearing requests, for which Defendants have issued decisions within 90 days of the requests for such hearings."  (Pl.'s Resp. 2)(emphasis in original).  By that calculation, the Success Rate for October 2013 would have been the 688 Successes divided by the sum of 6,511 (the outstanding

---

[17] Defendants have provided to Plaintiff certain numerical information regarding Espinosa Class fair hearings covering at least the period from January 2013 to March 2014, provided in a spreadsheet quantifying the activity in each month in each step of the fair hearing process.  It includes data for:  Requests, Scheduled, Adjourned, Reopoen, Gain/Loss (i.e., overall increase or decrease in backlog), Heard, Default, Withdraw, and (DAFH) issued.  Additional figures were provided at Plaintiff's request: Avg. days to issue, Median, and Standard Deviation.

backlog) plus any other pending fair hearing requests, i.e., no higher than 10.6%.

This Court has previously employed the Success Rate calculation method described by Defendants. (See Summary Judgment Order at 21) ("[T]he record reflects that in New York City alone, Defendants' rate of noncompliance with the ninety day requirement (after excluding all adjournments) as a percentage of the total number of statewide Medicaid fair hearing decisions rendered was [yearly percentages] ... .".) Moreover, Plaintiff cited these statistics—not the "successes as a total of pending" model described above—in its submissions in support of summary judgment. (See, Plaintiff's Statement Pursuant to Local Civil Rule 56.1, dated Oct. 28, 2011 [dkt. no. 55], ¶ 8-11; Plaintiff's Memorandum of Law in Support of Her Motion for Partial Summary Judgment, dated Oct. 28, 2011 [dkt. no. 56], 4-5.) Prior citation of Defendants' statistical measure is not dispositive evidence Plaintiff agreed with that method for calculating Success Rate, but it does demonstrate that this Court and both parties previously relied on that formula in connection with the parties' earlier motions for summary judgment. Although Plaintiff clearly desires a different calculation, Plaintiff fails to cite a factual argument in support of that change.

Most important in this determination is this Court's own language. Specifically, the phrase "total number of statewide ... hearing decisions <u>rendered</u> ... ." (Summary Judgment Order at 21) (emphasis added). Rendering a decision is the trigger for determining whether that fair hearing falls within the ninety day time limit. The only difference between the Success Rate statistics relied upon in the Summary Judgment Order and the Success Rate statistics provided by Defendants in the present motion is that the former was expressed as a yearly percentage and the latter as a monthly one. Moreover, Plaintiff's proposed figure for the denominator in the percentage calculation would include <u>all</u> "pending" requests, which presumably includes fair hearings that are not past the ninety-limit, not counting adjournments. This would result in an inaccurate representation of the status of Defendants' compliance.

Accordingly, the Court adopts the Success Rate calculation method advanced by Defendants, as it did in the Summary Judgment Order. This finding informs the Court's exercise of its "equitable remedial discretion" in fashioning an injunction.

2. The Proposed Orders

    i.   Monitoring Requirements

      Both Proposed Orders provide for Court monitoring of Defendants' compliance with the Summary Judgment Order.  (See, Pl.'s Proposed Order ¶1; Defs.' Proposed Order ¶3).  For the reasons stated below, the Court adopts Defendants' Proposed Order.

      Defendants do not dispute that the Court may direct Defendants to provide reports to Class Counsel documenting Defendants' compliance with the Summary Judgment Order.  (See Defs.' Proposed Order ¶ 3.)  However, the parties disagree on the scope of that monitoring; specifically, whether Defendants must provide individualized information for each fair hearing request that violates the ninety day period.  In addition to DAFH issuance statistics,[18] Plaintiff's Proposed Order would also require Defendants to provide "names, addresses and telephone numbers of any individuals whose hearings are not decided in a timely fashion and their aid-continuing status ... ."

_____

[18] "Defendants shall provide to Class Counsel on a monthly basis ... a report of all DAFHs for Class Members issued during the reporting month for a period of twenty-four (24) reporting months.  This report shall contain at a minimum: (a) the identifying number associated with each Fair Hearing request; (b) the date the Fair Hearing was requested; (c) the date(s) Fair Hearing(s) were held; (d) the date of issuance of the DAFH; and (e) the number of days excluding adjournments from the date of the Fair Hearing Request to the date of issuance of the DAFH."  Defs.' Proposed Order ¶ 3.

(See Pl.'s Proposed Order ¶ 1.)  Plaintiff argues such relief is
necessary to allow Class Counsel to assist individual plaintiffs
in obtaining recourse for violations of the ninety day limit.
Defendants counter that requiring reports including such
specific information is overbroad.

        Plaintiff's argument is not persuasive for several
reasons.  As a threshold matter, the legal authority Plaintiff
cites for the proposition that a district court may order such
individualized information regarding monitoring for failed
timeliness public benefit cases does not control here.  Barnett
v. Bowen involved a class action seeking declaratory and
injunctive relief on behalf of social security disability
claimants who had suffered substantial delays in scheduling and
issuance of decisions.  Barnett v. Bowen, 794 F.2d 17, 23-24 (2d
Cir. 1986) (holding that, upon remand to a district court to
fashion remedial relief in class actions brought on behalf of
social security disability claimants who had experienced
unreasonable delays in hearings and/or issuance of
administrative decisions, district court is authorized to order
filing of status reports for individual cases, among other
relief).  Plaintiff correctly states Barnett's holding, but
incorrectly applies it.  Barnett dealt specifically with Social
Security benefits.  Id.  In that context, the Supreme Court

explicitly rejected certain forms of class-wide relief but left
open the door for district courts to authorized injunctive
relief in individual suits for unreasonable delay.  See Heckler
v. Day, 467 U.S. 104, n.33 (1984) ("We make clear that nothing
in this opinion precludes the proper use of injunctive relief to
remedy individual violations of [applicable Social Security
law].").  The upshot is that Barnett authorized monitoring of
individual suits alleging unreasonable delays in the Social
Security administrative process because Heckler essentially
endorsed such relief instead of a class-wide injunction.

Conversely, the present case is an action for class-
wide, not individual, relief.  (See Class Certification Order.)
In this setting the entire point is to secure relief for the
class as a whole, as opposed to seeking individual Social
Security benefits.  As for any certified class, the Espinosa
Class (see supra n.1) is entitled to "final injunctive relief
... respecting the class as a whole."  See Fed. R. Civ. P.
("Rule") 23(b)(2).

In addition to legal arguments, Plaintiff also cites
pragmatic concerns to support its assertion that Defendants must
provide information regarding individual cases to achieve
effective monitoring.  Indeed, Class Counsel points to her own
experience with the Varshavsky case, where in 1992 the New York

State Supreme Court required Defendants to provide individual
contact and other information to class counsel.  See Second
Keilin Decl. ¶ 1-12.  Class Counsel's experience with Varshavsky
is taken into consideration, but that case is not binding on
this Court.  More importantly, this Court's Class Certification
Order explicitly excepts Varshavsky class members from the
Espinosa Class (see supra n.1) and subsequently denied
Plaintiff's request to amend the Espinosa Class to include
members of the Varshavsky class.  (See Order, dated Apr. 4, 2014
[dkt. no. 103], 3-4.)

        A more fitting reference is the injunction issued in
Shakhnes, originally brought as a companion case to the present
action.[19]  Although Shakhnes class members, like Varshavsky class
members, are specifically excepted from the Espinosa Class,
Shakhnes' formulation of injunctive relief is helpful.  (See
Order, dated Sept. 21, 2012 [06 Civ. 4778, dkt. no. 166]
("Shakhnes Injunction").)  As a federal case decided on federal
law in the relatively recent past, Shakhnes is both more germane
and temporally proximate to the present action.  In Shakhnes,
the court ordered that Defendants provide, for each fair hearing
requested during the previous twelve months: the date the fair
hearing was requested; the date the fair hearing was first

_____

[19] See Summary Judgment Order at n.1.

scheduled; any adjournments; date of DAFH; and date that final administrative action was achieved.  (See id. ¶ 13.)  These monitoring requirements are nearly identical[20] to those provided for by Defendants' Proposed Injunction (see Defs.' Proposed Order ¶ 3), and this Court finds such relief appropriate here as well.

  ii.  Notice

   The flip-side of monitoring—ensuring Defendants' compliance—is notice, the procedure for notifying Class Members when Defendants are noncompliant.  Plaintiff's Proposed Order would require Defendants to send notice to individual Class Members upon failure to meet the ninety day deadline (see Pl.'s Proposed Order ¶ 4), whereas Defendants propose a "meet-and-confer" mechanism to address noncompliance (see Defs.' Proposed Order, ¶¶ 4-5).  This Court adopts a modified version of Defendants' Proposed Order.

   Similar reasoning to that outlined above applies here as well.  Class Members are not entitled to individual notice because any relief is for the class as a whole.  (See Class Certification Order; Rule 23(b)(2).)  Based on this reasoning, Plaintiff may point to this Court's reference to the Shakhnes Injunction with respect to monitoring and ask why the same logic

---

[20] Here, issuance of a DAFH is considered final administrative action. (Amiraian Decl. ¶10.)

does not apply to notice because Shakhnes provided for type of individualized notice and relief Plaintiff now seeks.  (See Shakhnes Injunction ¶ 15.)

First, it bears repeating that Shakhnes class members have explicitly not been included in the Espinosa Class. Shakhnes differs from the present action in its procedural posture, the breadth of the classes and, most relevant here, the scope of the claims.  See, Shakhnes 740 F.Supp at 609.  In addition to a claim for untimely administrative hearings, the Shakhnes complaint also asserted causes of action for failures to provide either adequate notice of the right to appeal or temporary interim services pending a decision by the fair hearing officer.  Id.  Moreover, the Shakhnes class is composed of individuals requesting a range of relief regarding home health services; the Espinosa Class challenges decisions relating only to their financial eligibility for Medicaid. Therefore, while individual notice was an appropriate remedy in Shakhnes, it is not one here.

Notwithstanding Plaintiff's requested individual notice remedy being inappropriate, the Court finds features of Defendants' proposed "meet-and-confer" mechanism problematic. To be sure, such a procedure allows Defendants to focus on ensuring timeliness in all cases, as opposed to intruding on the

state's administration of its own affairs by shifting the focus

to individual cases.  See Ass'n of Surrogates, 966 F.2d at 79.

Limiting any future action for enforcement of this Order to

systemic noncompliance also makes sense from an efficiency

standpoint, as does mandating that the parties negotiate before

making any motion to enforce this Order.  However, Plaintiff's

counterpoint is well-taken: adding such a notice requirement and

placing the burden on Plaintiff to prove systemic noncompliance

with this Order "would, in essence, be relitigating the

underlying issue in this lawsuit each time."  (Pl.'s Resp. 6.)

It is also difficult to argue with Plaintiff's logic that

requiring Plaintiff to notify Defendants of statistics the

latter provided the former in the first place is, at best,

redundant.

        Therefore, instead of adopting Defendants' formulation

wholesale, the Court accepts the meet-and-confer framework but

declines to place the burden on Plaintiff to prove systemic

noncompliance.  Determining systemic noncompliance will be, as

it is here, a fact-based determination.  And in keeping with

this Order, among those facts considered will be raw totals and

trends—that is to say, evidencing greater or lesser compliance

with this Order—in the two relevant metrics described above in

detail: backlog and Success Rate.  While the Court declines to

identify a specific figure or percentage as a demarcation between compliance and noncompliance, suffice to say that trends over time in either direction will be a persuasive consideration in any future action to enforce this Order.  As outlined above, individualized relief is not appropriate, and the Court adopts Defendants' limitation on any motion to enforce this Order with respect to individual untimely administrative action, unless such individual untimely administrative action demonstrates systemic noncompliance with the terms of this Order.  This remedy is appropriate and within the Court's broad remedial powers.  See Ass'n of Surrogates v. N.Y., 966 F.2d at 79.

### iii.   Interim Medicaid Benefits

Plaintiff's Proposed Order would require Defendants to provide "interim Medicaid benefits" to certain Espinosa Class Members.[21]  (See Pl.'s Proposed Order ¶ 2.)  Defendants argue such relief is not supported by federal or state law and, alternatively, is barred by the Eleventh Amendment to the United States Constitution.  (See Defs.' Resp. 4-8.)  This Court declines to adopt Plaintiff's Proposed Order because federal and

---

[21] "Defendants shall grant interim Medicaid benefits in the form and amount requested on the Fair Hearing request forms, pending the issuance of Class members' fair hearing decisions, to members of the class who have had their applications for Medicaid services denied, have had their requests for an increase in Medicaid services denied or have had their Medicaid services decreased and do not have 'aid to continue' ... ." Pl.'s Proposed Order ¶ 2.

state law and regulations do not provide for "interim Medicaid benefits;" further, such relief is not supported by case law and would yield illogical results.

Certain Medicaid recipients are entitled to aid-continuing, i.e., to have their Medicaid benefits remain unchanged from the date of the request through the date the DAFH is issued. See 42 C.F.R. § 431.230(a); 18 N.Y.C.R.R. § 358-3.6. However, neither Medicaid (i) applicants challenging the denial of their applications nor (ii) recipients challenging the denial of their requests for increased care are entitled to aid-continuing. 18 N.Y.C.R.R. § 358-3.6(2). Federal law provides only limited eligibility exceptions for those who already have been determined eligible for Medicaid. See 42 U.S.C. § 1396(a)(34) ("[I]n the case of any individual who has been determined to be eligible for medical assistance under the plan, such assistance will be made available to him for care and services included under the plan ... ."). Therefore there is no basis in federal or state law to provide "interim Medicaid benefits" to the Espinosa Class Members indicated in Plaintiff's Proposed Order.

Similarly, there is no support in case law for such remedial relief. Plaintiff argues that the Court of Appeals has "long held that interim benefits are an appropriate remedy when

government Defendants have failed to live up [to] the timeliness requirements in public benefits cases." (See Pl.'s Reply 3.) However, the cases Plaintiff cites in support of that argument[22] are distinguishable because each involves a court order directing the Social Security Administration to provide interim payments where the agency exceed Court-imposed time limits. As Defendants correctly point out, these cases are limited to circumstances where a federal agency is required to spend federal money on interim benefits. Here, such a measure—even if there were a statutory basis for it—would require ordering a state agency to spend federal money on interim benefits.

In addition to statute and case law, it also bears pointing out that adopting the "interim benefits" provision in Plaintiff's Proposed Order would not necessarily help those in need of aid-continuing. An individual does not become a Class Member unless and until Defendants have failed to provide a timely decision after fair hearing. (See Class Certification Order at 181.) Therefore, the result of Plaintiff's Proposed Order would be that an individual would be without such "interim benefit" during the fair hearing process, at least ninety days (assuming no adjournments), and would then receive that benefit

---

[22] See Heckler, 467 U.S. at n.33; Day v. Schweiker, 685 F.2d 19, 23-24 (2d Cir. 1982), vacated, Heckler, 467 U.S. at 105; Barnett v. Bowen, 580 F.2d at 23-24; Barnett v. Califano, 580 F.2d 28, 32 n. 12 (2d Cir. 1978).

from the date the hearing is no longer timely until a fair decision is issued.  That is illogical and defeats the purpose of interim benefits.

Although a district court has broad discretion in fashioning an equitable remedy for a constitutional violation, creating a new public benefit not supported by statute, case law, or logic qualifies as a remedy that would "intrude unnecessarily on a state's governance of its own affairs." Ass'n of Surrogates, 966 F.2d at 79.  Moreover, especially in the context of Medicaid, a prominent legislative program co-administered by the Federal Government and State Governments, this Court's discretion is necessarily bounded by "principles of federalism."  Dean, 804 F.2d at 213 (quoting Rizzo v. Goode, 423 U.S. 362, 379 (1976)).

### iv.  Financial Penalty for Noncompliance

Plaintiff's Proposed Order requests that this Court order Defendants pay a fine, $10 per day for untimely fair hearing requests, to Class Members who received aid-continuing. (See Pl.'s Proposed Order ¶ 3.)  This would function as an alternate remedy to "interim Medicaid benefits" proposed for those without aid-continuing, discussed above.  Defendants object to this remedy on the grounds that fines should only be imposed upon a finding by the court of repeated noncompliance.

29

For the reasons stated below, this Court declines to adopt
Plaintiff's Proposed Order, but does not foreclose ordering such
relief in the future.

This Court has broad equitable authority to fashion an
appropriate remedy in giving effect to its prior Orders, and a
finding of contempt is not a prerequisite for enforcement. U.S.
v. Visa U.S.A., Inc., 2007 WL 1741885, *3 (S.D.N.Y. 2007)
("Ensuring compliance with a prior order is an equitable goal
which a court is empowered to pursue even absent a finding of
contempt.") (quoting Berger v. Heckler, 771 F.2d 1556, 1569 (2d
Cir. 1985)). Therefore this Court has the ability to impose a
penalty or sanction on Defendants for noncompliance with its
prior Orders, with or without a finding of contempt or bad
faith. Id. ("[T]he lack of a finding of contempt or of bad
faith should not preclude exercise of inherent equitable powers
to achieve fair remedial results.") (quoting Alexander v. Hill,
707 F.2d 780, 783 (4th Cir. 1983)).

Despite a formal finding of contempt, however, each of
the cases cited in the previous paragraph featured long-standing
noncompliance with multiple court orders and violation of
federal law. In U.S. v. Visa U.S.A., MasterCard moved to
enforce a judgment, and a Special Master was appointed to
resolve the dispute (Visa, 2007 WL at *1); Berger involved

30

enforcement of a consent decree entered approximately seven years prior to that case being decided (Berger, 771 F.2d at 1558); and in Alexander, the district court had previously concluded as a matter of law that there had been widespread failure by the defendants to comply with previous orders entered in the proceedings (Alexander, 707 F.2d at 782).

Take for example Rodriguez v. Swank, which both parties cite in support of their respective arguments regarding imposition of a fine.  Rodriguez v. Swank, 496 F.2d 1110 (1974). A brief review of Rodriguez and a comparison to the present case is instructive why, at this juncture, this Court declines to adopt Plaintiff's Proposed Order requesting fines as a remedial remedy.  In 1970, the district court entered an order requiring timely compliance.  Two years later, in response to a contempt complaint by plaintiffs alleging noncompliance with the 1970 Order, the district court again ordered timely compliance and this time "gave the defendants three months to begin complying with the court decree or begin paying $100 to every AFDC applicant whose rights were violated."  Id. at 1111-12.  On appeal, the Seventh Circuit affirmed the district court's order, finding that "[m]oney payments contingent on noncompliance are a traditional means of enforcing injunctions."  Rodriguez, 496

31

F.2d at 1113 (citing U.S. v. Mine Workers, 330 U.S. 258, 305 (1947)).

Both parties analogize Rodriguez to the present case, albeit in support of different arguments.  Plaintiff argues that Defendants, by virtue of noncompliance with the Summary Judgment Order, have evidenced the same sort of noncompliance as defendants in Rodriguez and therefore imposition of a fine is appropriate.  Conversely, Defendants characterize the noncompliance in Rodriguez as a willful violation of a court order and argue that fines should only be imposed upon a finding by the court of repeated noncompliance.

This action is different from Rodriguez.  As a procedural matter, Plaintiff did not bring a contempt action; rather, the present case is the result of failed settlement negotiations, and its purpose is to implement appropriate injunctive relief.  Second, and more importantly, this Court does not find Defendants to be willfully violating its Summary Judgment Order.  To the contrary, Defendants have endeavored to improve compliance by more efficiently deploying ALJs, implementing the PHD process, promulgating legislation providing a financial incentive for social service districts to decrease their backlogs, and exploring the possibility of video hearings, among other measures.  (See Amiraian Decl. ¶¶ 15-21.)  Moreover,

32

the Success Rate has improved (see supra II.B.1), and Defendants expect full compliance in November 2014 (see Amiraian Decl. ¶ 15). While a finding of formal contempt is not necessary to impose fines, as demonstrated by Rodriguez and the cases described above, courts have employed that measure in situations featuring repeated, willful noncompliance and lackluster effort to achieve such compliance.

That said, if Defendants fail to comply with this Order going forward, imposition of fines may be an appropriate remedy (see Berger, 771 F.2d at 1569) and would qualify as prospective injunctive relief not barred by the Eleventh Amendment (see Quern v. Jordan, 440 U.S. 332, 337 (1979) ("[A] federal court may, consistent with the Eleventh Amendment, enjoin state officials to conform future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury.") (quoting Edelman v. Jordan, 415 U.S. 651, 676-77 (1974)). Compelling Defendants to engage a nationally recognized court administration consultant, as Plaintiff has suggested, would also be appropriate prospective injunctive relief.

v.   Enforcement

Plaintiff proposes a permanent injunction to enforce this Order (Pl.'s Proposed Order ¶ 5); Defendants request that the Court retain jurisdiction for a period of twenty-four months to address any future noncompliance (Defs.' Proposed Order ¶ 7). At this time, the Court adopts Defendants' Proposed Order and declines permanent injunctive relief.

As discussed above, this Court has broad remedial powers to fashion equitable relief.  See Eng v. Smith, 849 F.2d at 82.  However, the Supreme Court has repeatedly warned district courts "not to move too quickly where it appears that the state, in the exercise of its administrative authority, will in its own way adopt reforms bringing its system into compliance with the Constitution."  Dean, 804 F.2d at 213.  Where government defendants have professed ability and intention to comply, a district court may decline to enter a permanent injunction and instead maintain jurisdiction for a period of time in order to ensure compliance.  See Nelson v. Sugarman, 361 F.Supp. at 1142.  The authority to issue an injunction is an extraordinary and powerful one that is to be used sparingly and cautiously and only in a "clear and plain" case.  Reynolds v. Giuliani, 506 F.3d 183, 198 (2d Cir. 2007) (quoting Rizzo, 423 U.S. at 378).

Defendants have made headway in decreasing the backlog and increasing compliance with the Summary Judgment Order, as evidenced by the rising Success Rate. (See II.A.) Defendants have also demonstrated their intent to attain full compliance by instituting a number of reforms, as well as proposing others. (See Amiraian Decl. ¶¶ 15-21.) Therefore, at this time, a permanent injunction is not appropriate. However, the Court will retain jurisdiction over this action for a period of twenty four months from the month this Order is entered, or such later time as agreed to by the parties or ordered by this Court, for purposes of enforcing this Order.

III. CONCLUSION

For the reasons discussed above, Plaintiff's motion to approve its proposed order [dkt. no. 115] is DENIED. Defendants' motion to approve its proposed order [dkt. no. 110] is GRANTED in part, with the alteration to the notice provision described above.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1.  Beginning no later than the effective date of this Order, Defendants shall provide final administrative action in compliance with the timeliness provisions set forth in 42 C.F.R. § 431.244(f)(1) for fair hearings requested by Class Members.

2.  In calculating whether final administrative action was provided in compliance with paragraph one of this Order, the calculation of days from the date of the request for a fair hearing to the date of the DAFH shall exclude any days of an adjournment of a fair hearing requested by the Class Member or of any adjournment not requested by the Class Member which was granted by OAH for the benefit of all fair hearing participants, such as for severe weather conditions, other conditions potentially affecting the health or safety of fair hearing participants, or other circumstances rendering the fair hearings operations inoperable.  Fair hearings requested

by members of classes certified in Shakhnes and Varshavsky,
shall be excluded from paragraph one of this Order.

3.    For fair hearing requests made on or after the first
day of the first calendar month after the entry of this Order
("reporting month"), Defendants shall provide to Class Counsel
on a monthly basis, by the twentieth day of the succeeding
month, a report of all DAFHs for Class Members issued during
the reporting month for a period of twenty-four reporting
months.   This report shall contain at a minimum: (a) the
identifying number associated with each fair hearing request;
(b) the date the fair hearing was requested; (c) the date(s)
fair hearing(s) were held; (d) the date of issuance of the
DAFH; and (e) the number of days excluding the adjournments
described in paragraph two above from the date of the fair
hearing request to the date of issuance of the DAFH.

4.    If Class Counsel believes that Defendants have
failed to comply with this Order, Class Counsel shall notify
Defendants' counsel in writing of the nature and specifics of
the alleged failure to comply with this Order and shall
specify the monitoring reports, if any, upon which such belief
is based, at least thirty business days before any motion is
made for enforcement of this Order. Unless otherwise resolved,
counsel for the parties shall meet within thirty business days

37

following notice to Defendants' counsel to attempt in good faith to arrive at a resolution of the claims. If no such resolution is reached within thirty business days following notice to Defendants' counsel, the class shall have leave to move this Court for an order for all appropriate relief. In any such motion, the Court will first look to relevant statistics indicating Defendants' compliance with this Order.

5.   Class Counsel will not file a motion to enforce this Order with respect to individual untimely administrative action, unless such individual untimely administrative action demonstrates systemic noncompliance with the terms of this Order.

6.   Plaintiff is entitled to reasonable attorney's fees, costs and disbursements as provided by 42 U.S.C. § 1988. The amount of attorney's fees, costs, and disbursements is reserved for later determination upon application to the Court within ninety days after the entry on the docket sheet of a "So Ordered" copy of this Order or within a later date as the parties may stipulate to in writing.

7.    The Court will retain jurisdiction for a period of twenty-four months from the month of entry of this Order, or such later time as agreed to by the parties or ordered by this Court, for purposes of enforcing this order.  The parties may make application to amend this Order within six months of the effective date of this Order.


SO ORDERED.


Dated:     New York, New York
           December 4, 2014


                                   LORETTA A. PRESKA
                                   Chief U.S. District Judge